## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ROYAL INSURANCE COMPANY OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | 8:02CV577 |
| vs. | ) ) | MEMORANDUM |
| DUHAMEL BROADCASTING ENTERPRISES, | ) ) ) ) | AND ORDER |
| Defendant. | ) ) | |

This matter is before the Court for decision after trial to the bench on November 8-9, 2004. The Court has jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000. The parties consented to jurisdiction by a United States Magistrate Judge and, on September 3, 2004, the case was transferred to the undersigned magistrate judge by United States District Judge Robert T. Dawson, pursuant to 28 U.S.C. § 636(c). **See** Filing No. 110.

## BACKGROUND

Royal Insurance Company of America (Royal) instituted this action for declaratory judgment against Duhamel Broadcasting Enterprises (DBE) after Royal denied insurance coverage for damage to a television tower located near Hemingford, Nebraska. On September 24, 2002, the Hemingford tower, a 1,965-foot tall guyed television transmission tower collapsed. The tower was a total loss. The collapse occurred when two crew members from Mid-Central Tower Company (Mid-Central) were working to improve the service load capacity of the tower to support a new digital antenna.

DBE made claims for coverage under an insurance policy issued by Royal for the tower. However, Royal disputes coverage for the tower exists under the insurance policy and denied coverage based on four reasons: (1) the Hemingford Tower was not Covered Property because it was in the course of construction at the time of its collapse; (2) the Hemingford

Tower was not Covered Property because it was undergoing repair or alteration at the time of its collapse; (3) the Hemingford Tower is excluded from coverage because its collapse resulted from faulty, inadequate or defective workmanship, repair, construction, renovation or remodeling; and (4) the Hemingford Tower is excluded from coverage because its collapse resulted from faulty, inadequate or defective materials used in repair, construction, renovation or remodeling. DBE contends Royal is liable for the property damage to the tower under the terms of the insurance policy. Alternatively, DBE claims Royal is liable for the property damages under the theories of promissory estoppel, reformation or negligence.

On June 16, 2004, the parties' cross motions for summary judgment were denied. **See** Filing No. 99. The court found genuine issues of material fact existed with respect to the scope of insurance coverage. *Id.* p. 5. However, the court determined Nebraska law should apply to the rights and obligations of the parties under the contract of insurance. *Id.* p. 4.

Before trial the plaintiff submitted a trial brief (Filing No. 112) and proposed findings of fact and conclusions of law (Filing No. 113). The defendant submitted a trial brief (Filing No. 104), a supplemental trial brief (Filing No. 116) and proposed findings of fact and conclusions of law (Filing No. 103). On November 8, 2004, at the conclusion of the plaintiff's case-in-chief, the defendant made an oral motion for judgment as a matter of law, which this Court took under advisement. **See** Filing No. 118 (court minutes). On November 9, 2004, at the conclusion of the evidence the defendant orally renewed its motion for judgment as a matter of law, which was taken under advisement. **See** Filing No. 120 (court minutes). On the same date, the plaintiff filed a motion for involuntary dismissal of the defendant's counterclaims. **See** Filing No. 119. The defendant responded to the motion by filing a brief (Filing No. 122). The plaintiff seeks leave to file a reply brief in support of the motion (Filing No. 124). The plaintiff's motion is granted and the reply brief (Filing No. 124, Exhibit A), will be considered *instanter*. On November 9, 2004, at the conclusion of the trial, the matter was deemed submitted.

2

## FINDINGS OF FACT

Based on the evidence presented and pursuant to Fed. R. Civ. P. 52(a), the court makes the following findings of fact:

DBE is in the business of radio and television broadcasting. It is a South Dakota corporation with a principal place of business in Rapid City, South Dakota. William Duhamel (Mr. Duhamel) has been the president of DBE since 1976. DBE broadcasts its signal into the Nebraska Panhandle. Its signal reaches Nebraska counties including Sioux, Dawes, Box Butte, Sheridan, Scottsbluff, Banner, Morrill, Garden, Kimball, Cheyenne, Devel and possibly Grant. DBE owns approximately fifteen towers ranging in height from 110 feet to 1500 feet. During 2002, DBE owned a tower approximately 1,965-feet in height located in Hemingford, Nebraska.

Royal is a Delaware Corporation with its principal place of business in Charlotte, North Carolina. In 2002, DBE purchased an insurance policy from Royal. The named insured was Duhamel Broadcasting. The insurance policy period was from July 1, 2002 through July 1, 2003. The insurance policy bears a policy number P2SV020097. The insurance policy listed, as part of the scheduled property, the Hemingford tower described as:

> Transmission Site
> NW ¼ sec 2 Twp 25 Range 51
> Hemingford NE, 69348

## A. The Hemingford Tower

The Hemingford tower was originally constructed in 1970 as a television transmission tower. The tower was supported by a concrete base and 24 guy wires, three each attached to one of eight concrete anchors. The tower consisted of 63 sections numbered sequentially beginning with section 1 at the top of the tower. Section 1 was 26 feet high, section 2 was 20 feet high and each of the other sections was 30 feet high. Each section was made up of three ten-foot panel subsections. Each panel subsection had three faces, which were comprised of two twelve-foot diagonal braces, ranging in size from 3/4" to 1 1/4" in diameter, with an

intermediate or "redundant" horizontal gird where the braces crossed.  Each panel was bordered by horizontal girds and the legs of the tower.

In May 1999, Structural Systems Technology, Inc. (SST) prepared a structural analysis of the Hemingford tower and made recommendations for structural modification to support the existing and proposed antennas and transmission lines.  **See** Exhibit 55.  Relevant to this action, SST recommended replacing the diagonal braces in sections 10 and 47 with stronger members.  In February 2001, SST and DBE entered into a contract wherein SST agreed to "Design, furnish and install stronger diagonal members in Sections 10 and 47 (2 sections) to replace the existing diagonal members."  **See** Exhibit 45.  The work was to be done in phases.  In a purchase order dated September 4, 2002, SST issued a request for Mid-Central to furnish the labor, tools and equipment required to complete the replacement of the diagonal members in sections 10 and 47.  **See** Exhibit 56.  Section 10 was to have twelve diagonal members from panels 1 and 2 replaced with larger diameter diagonal rods, from 1" rods to 1 1/8" rods.  In section 47, panel 1 was to have the six diagonal members replaced with larger diameter diagonal rods, from 3/4" rods to 7/8" rods.  **See, e.g.**, Exhibit 93.

On September 24, 2002, Mid-Central had three crew members on-site at the Hemingford tower, who were working on changing the diagonal rods in sections 10 and 47.  At the time of the tower's collapse, two crew members were on the tower at sections 10 and 47 and had removed and replaced a number of the diagonal members.  The tower first failed at section 47, panel 1, where diagonal rods had been removed without using a bracing system to compensate for the missing diagonals.  Due to excessive horizontal deflection, the tower legs at section 47 bent and broke, causing sections 1 through 46 to fall vertically forming a ball near the base of the tower and extending in a southeast direction away from the tower.  Under the vertical force, sections 47 through 60 fell sideways away from the tower extending to the southwest.  Sections 61 through 63 remained standing.  **See** Exhibit 92.  Accordingly, the tower failed because the crew members changing the diagonals compromised the tower's load bearing capacity by removing structural members while no temporary fixtures or temporary load paths were in place.

### B.     Insurance Policy

Until June 30, 2002, the Hemingford tower was insured by DBE with an insurance policy through Wausau Insurance Company (Wausau).  DBE's Wausau insurance broker was Scott Yeoman (Mr. Yeoman).  In early 2002, DBE learned Wausau would no longer insure broadcasting towers.  Mr. Yeoman put DBE into contact with the Dave Schmidt Insurance Agency, Inc. (DSIA).

On May 17, 2002, DBE appointed DSIA as its agent of record to approach various insurance carriers on DBE's behalf to make applications for insurance.  DSIA is in the insurance and financial services business and is owned by David Schmidt (Mr. Schmidt).  DSIA primarily places coverage with Farmers Insurance Group, but may place coverage with other carriers.

On May 20, 2002, DSIA submitted an application for insurance to Royal on behalf of DBE.  **See** Exhibit 3.  The application specifically requested property insurance coverage for DBE's towers including the Hemingford tower.  In the application, DBE provided a letter dated May 14, 2002, from Monte Loos (Mr. Loos), DBE's Operations Manager, which states no current tower inspection reports are available for the Hemingford tower.  Mr. Loos explains, "SST at this time is making necessary modifications to this tower for [a] High Definition Television antenna to be mounted sometime in the future.  These modifications will be completed in the summer of 2002 and, at that time, we will receive a letter from SST stating that the tower meets all standards."  **See** Exhibit 3-79.  Additionally, DBE included a Radio and T.V. Tower Questionnaire for towers valued at over $250,000 for the Hemingford tower.  **Id.** 3-157.  In the remarks section of the questionnaire, DBE states, "Tower is currently being updated for strength requirements.  Scheduled to be completed late Fall of 2002." **Id.** 3-158.  The questionnaire also states the Hemingford tower has a value of $5,000,000. **Id.** 3-157.

On June 6, 2002, Julie Tucker (Ms. Tucker), a senior underwriter for Royal, sent a letter to Mr. Schmidt requesting additional information necessary to prepare an insurance proposal.  **See** Exhibit 20.  The June 6 letter requested confirmation that DBE "obtain certificates of insurance with adequate limits from all subcontractors that work on and maintain [its] towers and that [DBE is] listed as additional insured on those policies."  **Id.** p. 2.  Additionally, the

June 6 letter stated, "[t]his is particularly important with the upgrade to HDTV." *Id.* DSIA responded on behalf of DBE by stating, "[a]ll subcontractors that work on or maintain our towers carry their own insurance and provide a copy of their insurance carriers, naming DBE as additional insured on these policies." **See** Exhibit 21, p. 5.

On June 27, 2002, Mr. Duhamel and Susan Hastings (Ms. Hastings), DBE's controller, met with Mr. Schmidt and Mr. Yeoman to review Royal's June 26, 2002 insurance proposal. The presentation included information about worker's compensation insurance and automobile insurance as well as Royal's proposal for property insurance. **See** Exhibit 22. The Royal proposal indicates the insurance is a "Royal Flex" product, described as:

> Royal Flex provides flexible solutions. This unique property product and supporting services are aimed at satisfying each client's particular situation. . . . Royal Flex is based on a thorough knowledge of your operations. Our people are committed to understanding not only your industry, but your individual business(es). For this reason, Royal Flex doesn't take a one-size-fits-all approach. Customization is key. . . . You can adjust Royal Flex to fit virtually any property exposure. And as its name implies, it has a built-in, seamless flexibility designed to satisfy your specific needs.

**See** Exhibit 22 at 3-5.

The exclusions listed in the property insurance section of the proposal are exclusions for war and military action and terrorism. **See** Exhibit 22 at 3-8 to 3-9.[1] However, on the bottom of every page of the proposal, the following language appears: "The insurance policies, not this descriptive proposal, will form the contract between the insured and the insurance company. In the event of a discrepancy between the proposal and the insurance policies, the policies will dictate the terms of coverage."

During the June 27, 2002 meeting, Mr. Duhamel agreed to accept the Royal property insurance proposal. On June 28, 2002, DSIA issued an insurance binder for Royal property insurance covering DBE's towers including the Hemingford tower. **See** Exhibit 26. The

---

[1] The policy also lists, without explanation, eight "Key Exclusions/Restrictions" in the general liability section and those same eight exclusions with an additional four in the umbrella, commercial liability policy section. **See** Exhibit 22 at 4-2, 6-2 to 6-3.

binder was effective for the period July 1, 2002, until September 1, 2002, as a temporary contract of insurance subject to the conditions on the back of the two-page form.  The form states "[t]he insurance is subject to the terms, conditions and limitations of the policy(cies) in current use by [Royal]."  *Id.* p. 2.

The binder is signed by Mr. Schmidt as an authorized representative of Royal.  Royal and DSIA entered into an Agency Agreement dated July 1, 2002, which provided limited authorization for DSIA to negotiate and solicit policies on behalf of Royal.  **See** Exhibit 17. The express language of the agreement provides DSIA "shall not issue any binders or policies of insurance without the prior written authorization of Royal."  *Id.*  Julie Tucker (Ms. Tucker), authorized Mr. Schmidt to sign DBE's binder before July 1, 2002.

On September 17, 2002, the insurance policy, bearing the number P2SV020097, was delivered to Mr. Duhamel and Ms. Hastings by Mr. Schmidt and Mr. Yeoman.  Mr. Duhamel did not read the insurance policy before the Hemingford tower collapsed on September 24, 2002.  The insurance policy contains the following relevant language:

### BROADCASTERS BUSINESS ASSURANCE (BBA)
### ROYAL FLEX COVERAGE FORM

Various provisions of this policy may restrict coverage. Read the entire policy carefully to determine rights, duties and what is and what is not covered.

\* \* \*

Certain words and phrases that appear in quotation marks in this form have special meaning.  Refer to DEFINITIONS.

\* \* \*

**INTEREST AND PROPERTY INSURED:**

1.      We cover your interest in and will pay for direct physical loss of or damage to all real and business personal property, . . .
        a. Owned; . . .
2.      You may construct additions, make alterations and repairs to the covered buildings and erect new buildings and structures. We cover:
        a.      Your interest in and will pay for direct physical loss of or damage to such property including supplies, materials, and temporary structures;

\* \* \*

**PROPERTY NOT COVERED** – Covered Property does not include:
1.      **"Towers"** in the course of construction.

7

2.      **"Towers"** undergoing repair or alteration, other than **"emergency repairs"** or **"routine maintenance"** if the loss or damage is caused by or results from the repair or alteration.

**See** Exhibit 18, p. 5-6.

The policy describes the covered losses and exclusions as follows:

**COVERED CAUSES OF LOSS** means RISKS OF DIRECT PHYSICAL LOSS OR DAMAGE to covered property, including:

1.      The explosion of gasses or fuel within the furnace of any fired vessel or within the flues or passages through which the gasses of combustion pass;

2.      Loss or damage to machinery and equipment as defined in "Loss to Objects."

but excluding those causes of loss listed in the EXCLUSIONS.

**EXCLUSIONS**

* * *

2.      We will not pay for loss or damage caused by or resulting from any of the following.  But if loss or damage by a Covered Cause of Loss results, we will pay for that resulting loss or damage.

* * *

i.      Faulty, inadequate or defective:

* * *

(1)     Planning, zoning, development, surveying, siting;

(2)     Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, impaction;

(3)     Materials used in repair, construction, renovation or remodeling; or

(4)     Maintenance;

of part or all of any property on or off insured "Premises and Location(s)";

**See** Exhibit 18, p. 14-15.

The insurance policy provides the following relevant definitions:

**"Emergency Repairs"** means immediate and necessary actions required by sudden and unexpected "occurrence" to prevent further loss or damage to **"towers"** from that "occurrence".

**See** Exhibit 18, p. 27.

8

"**Routine Maintenance**" means regular and customary activities to keep "**towers**" in a thorough state of repair. "**Routine Maintenance**" includes, but is not limited to, "**tower**" painting, tuning/retuning, adjusting guy tension or light bulb replacement.

\* \* \*

"**Tower**" or "**Towers**" means

a.      Guyed or self supporting transmitting or receiving structures and permanent attachments;

**See** Exhibit 18, p. 30.

# CONCLUSIONS OF LAW

## A.      Declaratory Judgment

Nebraska contract law governs this diversity action.  **See** Filing No. 99, p. 4.  Under Nebraska law, the interpretation, construction and effect of a contract are determined as a matter of law unless the contract is ambiguous.  *Guerrier v. Mid-Century Ins. Co.*, 663 N.W.2d 131, 135 (Neb. 2003).  An insurance policy is a contract.  *McGinn v. State Farm Mut. Auto. Ins. Co.*, 689 N.W.2d 802, 806 (Neb. 2004).  In this case, the parties do not necessarily dispute whether the insurance contract is ambiguous, however they interpret it differently.  Royal argues none of the language in the insurance contract is ambiguous and under the plain language no coverage exists.  In contrast, DBE contends the plain language of the insurance contract provides coverage in this matter.  Alternatively, DBE argues that if the Court finds the insurance contract to be ambiguous any ambiguity should be resolved in favor of DBE, the insured.  Therefore, the Court will first determine whether the insurance policy is ambiguous and second apply the policy language to the facts of this case.

The determination of whether a contract is ambiguous is a question of law, but the interpretation of an ambiguous contract is a question of fact.  *Plambeck v. Union Pac. R.R. Co.*, 509 N.W.2d 17, 20 (Neb. 1993).  "A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings."  *Guerrier*, 663 N.W.2d at 135.  "The fact that parties to a document have or suggest opposing interpretations of the document does not necessarily, or

by itself, compel the conclusion that the document is ambiguous." ***Big River Constr. Co. v. L & H Props., Inc.***, 681 N.W.2d 751, 756 (Neb. 2004). The Court has a duty to "fastidiously guard against the invitation to create ambiguities where none exist." ***Edgley v. Lappe***, 342 F.3d 884, 888 (8th Cir. 2003).

If a contract is unambiguous, the contract language must be given its "plain and ordinary meaning as the ordinary or reasonable person would understand them." ***Guerrier***, 663 N.W.2d at 134. When interpreting the plain meaning of the terms of an insurance policy, Nebraska courts have stated "the natural and obvious meaning of the provisions in a policy is to be adopted in preference to a fanciful, curious, or hidden meaning. [And] that [w]hile for the purpose of judicial decision dictionary definitions often are not controlling, they are at least persuasive that meanings which they do not embrace are not common." ***Katskee v. Blue Cross/Blue Shield of Neb.***, 515 N.W.2d 645, 649 (Neb. 1994). A contract must be construed as a whole, and if possible, effect must be given to every part thereof. ***Big River***, 681 N.W.2d at 756. "While an ambiguous insurance policy will be construed in favor of the insured, ambiguity will not be read into policy language which is plain and unambiguous in order to construe it against the preparer of the contract." ***Boutilier v. Lincoln Benefit Life Ins. Co.***, 681 N.W.2d 746, 750 (Neb. 2004).

There is no need, in this case, to look beyond the plain language of the contract. Royal contends no coverage for the Hemingford tower exists because the tower was not "covered property" at the time of the collapse for two reasons: (1) because the tower was undergoing repair or alteration at the time of its collapse; or (2) because the tower was in the course of construction at the time of its collapse. **See** Exhibit 18, p. 6 (Policy). Alternatively, Royal argues the policy specifically excludes coverage for loss or damage to the tower because the collapse was caused (1) as a result of faulty, inadequate or defective workmanship, repair, construction, renovation or remodeling; or (2) as a result of faulty, inadequate or defective materials used in repair, construction, renovation or remodeling. **See** Exhibit 18, p. 14-15. DBE contends the tower was covered property and not subject to an exclusion at the time of the collapse. The Court will evaluate each of the four policy sections below.

When an insurer has denied coverage for a loss, the burden of proving coverage under a policy is on the insured. *Farm Bureau Ins. Co. of Neb. v. Martinsen*, 659 N.W.2d 823, 827 (Neb. 2003); *Coppi v. West Am. Ins. Co.*, 524 N.W.2d 804, 813 (Neb. 1994). However, the insurer has the burden of proving that exclusions in the policy apply to exclude coverage for a loss because such exclusions constitute affirmative defenses. *Farmers Mut. Ins. Co. of Neb. v. Kment*, 658 N.W.2d 662, 668 (Neb. 2003); *Coppi*, 524 N.W.2d at 813.

## 1.    Repair or Alteration

Royal contends no coverage for the Hemingford tower exists because the tower was not "covered property" at the time of the collapse as the tower was undergoing repair or alteration at the time of its collapse.  **See** Exhibit 18, p. 6.  The insurance policy specifies that "Covered Property does not include: . . .  2.  **'Towers'** undergoing repair or alteration, other than **'emergency repairs'** or **'routine maintenance'** if the loss or damage is caused by or results from the repair or alteration."  **See** Exhibit 18, p. 5-6.  There is no dispute the Hemingford tower was a "tower" within the definition of the policy.  The policy also defines "emergency repairs" and "routine maintenance." Emergency Repairs means "immediate and necessary actions required by sudden and unexpected 'occurrence' to prevent further loss or damage to 'towers' from that 'occurrence.'"  **See** Exhibit 18, p. 27.  Routine Maintenance means "regular and customary activities to keep 'towers' in a thorough state of repair. Routine Maintenance includes, but is not limited to, 'tower' painting, tuning/retuning, adjusting guy tension or light bulb replacement."  **See** Exhibit 18, p. 30.

Royal argues that the Hemingford tower was undergoing repairs or alterations at the time of the collapse, under the customary usage of the undefined terms repair and alteration.  Further, Royal argues the work being done cannot constitute emergency repairs or routine maintenance.  Royal states the evidence in support of its contention is the nature of the work to be done on the tower in conformance with the earlier contract between DBE and SST, then SST and Mid-Century.  Specifically, such evidence shows the work being done was not an emergency repair or routine maintenance, but to allow the tower to accommodate a larger and heavier digital antenna. Royal argues the strengthening was "repair" work to restore the tower

to a sound and healthy state.  Alternatively, the work was an "alteration" by giving the tower the capability to accommodate the digital antenna, but without changing the tower into something else.   Since the collapse was caused by the activities associated with the tower's strengthening or upgrade, Royal contends the occurrence renders the tower "not covered property" at the time of the collapse.

Further, Royal relies on a letter written by Mr. Duhamel on October 30, 2002, after the collapse, where Mr. Duhamel states:

> I believe this [policy language] should have been called to our attention at the time or prior to your placing a binder upon Duhamel Broadcasting Enterprises' property, and also at the time the policy was delivered to us on September 17, 2002, <u>as the tower was undergoing repair or alteration at that time, which you knew</u>.

**See** Exhibit 53, p. 2.

Mr. Duhamel's October 30, 2002 letter to DSIA was partially in response to a letter dated October 10, 2002, from Royal.  **See** Exhibit 31.  Royal's October 10 letter quotes the policy language which states that towers under "repair or alteration" are not covered property. Royal contends the October 30 letter is the best evidence of Mr. Duhamel's understanding of the terms repair and alteration, rather the his "tortured" definitions from his deposition.

DBE argues the tower was clearly not undergoing repair or alteration.  DBE argues the tower was not undergoing "repair," because the tower had not been broken.  DBE contends a mere 1/8" increase in the diameter of a few diagonals in such a large tower cannot reasonably be an alteration.  DBE also argues Tucker, a representative of Royal, admitted the tower was not undergoing repair or alteration.  Alternatively, DBE argues, even if the tower were undergoing repair or alteration, such repair or alteration did not cause the damage to the tower.  DBE contends the damage to the tower was caused by the Mid-Century crew's failure to use temporary bracing, rather than the strengthening of the tower.   Specifically, increasing the strength of the tower would not cause it to collapse.  DBE argues that since Royal knew about the work being done to the Hemingford tower, prior to issuing the policy, and because the policy was a "flex" or customized policy, DBE understood and expected the tower to be covered for the known risks during the 2002 modifications to the tower.  Finally,

DBE contends that since the proposal did not contain the exclusionary language now relied upon by Royal, and DBE was not specifically told about the additional language, such language should not apply.

### a.    Repair

Repair is defined as "2.  To restore (a composite thing, structure, etc.) to good condition by renewal or replacement of decayed or damaged parts, or by refixing what has given way; to mend.  3.  To renew, renovate (some thing or part); to restore to a fresh or sound condition by making up in some way for previous loss, waste, decay, or exhaustion." OXFORD ENGLISH DICTIONARY (2d ed. 1989).  Royal contends that consistent with the dictionary definition, the work being done by Mid-Century was being done to restore the tower to a sound condition.  In contrast DBE argues no repair work was taking place because the work was not in response to prior damage.  Accordingly, the parties' contentions are based on a factual determination about the characterization of the work being performed rather than differing constructions of the term repair.

The Court finds the policy term "repair" is unambiguous.  Based on the facts presented during the trial, the Court finds the Hemingford tower was not undergoing repair at the time of the collapse, nor did any repair work cause or result in the collapse of the tower.  The evidence shows that in conjunction with the SST contract, the tower was to be painted and adjustments made to the guy wires.  However, the work being done by the Mid-Century crew in September 2002, related only to strengthening the tower for the additional weight of a digital antenna. There was no evidence such work would have otherwise been done to repair damaged diagonal rods or to maintain the structural integrity of the tower without the foreseen additional antenna.  Accordingly, the Court finds the term "repair" unambiguous and it cannot be reasonably construed to include the work being done on the Hemingford tower when it collapsed.  Therefore, Royal cannot deny coverage under the "undergoing repair" provision in the policy.

### b.    Alteration

The parties differ in their interpretations of the meaning of alteration.  Royal contends the term means "to make different without changing into something else."  However, DBE contends the term incorporates the change into something else.  Alternatively, DBE argues the work being done was not substantial enough to be an alteration.

Alteration is defined as "1.  The action of altering or making some change in a thing. 2.  A change in the character or appearance of anything, viewed as a fact; an altered or changed condition."  OXFORD ENGLISH DICTIONARY (2d ed. 1989).  Similarly, the verb form of alter is defined as "1. a. To make (a thing) otherwise or different in some respect; to make some change in character, shape, condition, position, quantity, value, etc. without changing the thing itself for another; to modify, to change the appearance of."  *Id.*  An alternative definition is "2.  To become otherwise, to undergo some change in character or appearance."  *Id.*

The definition of alteration may incorporate the concept of a change into something else, i.e., a change in character.  However, the definition of the term alter specifically includes the qualification "without changing the thing itself for another."  The terms do include "some change" and list different types of change, such as condition and value.  Further, the term alteration as used in the insurance contract cannot possibly incorporate the concept of changing a tower into some other type of structure.  The insurance contract specifically relates to towers and towers undergoing alteration.  The insurance contract lists all of the towers separately from other insured property and contains some provisions only applicable to towers.  Finally, the policy differentiates between "alteration" and other activities such as renovation and remodeling, which may incorporate substantial changes to an existing tower or building.  **See, e.g.,** Exhibit 18, p. 6 and 15.  Hence, the plain meaning of the term alteration does not include the fanciful meaning urged by DBE, that the tower would have to be changed into something beside a tower to apply the insurance contract's "undergoing alteration" provision.

The Court finds the policy language "undergoing alteration" is unambiguous.  The plain language of the insurance policy supports Royal's position that the phrase refers to the change

of a tower without converting the tower into a different structure. Accordingly, under the natural and obvious meaning of the term "alteration," in conjunction with its use in the policy, construed as a whole, the Court finds the term unambiguous.

Furthermore, the term alteration is reasonably construed to include the work being done on the Hemingford tower when it collapsed. The evidence presented at trial shows the relatively small change in the diameter of only a few diagonals was necessary to improve the vertical load and structural integrity of the Hemingford tower to support the additional weight of a digital antenna. The modifications to the tower were made to modify the "character, shape, condition, position, quantity, value, etc. without changing the thing itself for another." Finally, the Court finds the damage to the tower was caused by or resulted from the alteration. Therefore, the Court finds the insurance contract's provision defining property not covered as towers undergoing alteration applies to Hemingford tower at the time of its collapse.

### 2.    Course of Construction

Royal contends no coverage for the Hemingford tower exists because the tower was not "covered property" at the time of the collapse because the tower was in the course of construction at the time of its collapse. **See** Exhibit 18, p. 6. The policy specifically provides that towers in the course of construction are not considered covered property. *Id.* There is no dispute the term "towers" in this provision includes the Hemingford tower. The parties dispute whether the Hemingford tower was "in the course of construction" at the time of the collapse.

The phrase "in the course of construction" is not defined in the policy. DBE argues the tower was constructed initially in 1970, therefore it could not be under construction at the time of the collapse in 2002. Additionally, DBE states that it defies logic to define the act of changing 18 diagonal bars, with an increased diameter of 1/8", on a 1,965 foot tower as the course of construction. Finally, DBE relies on witness testimony, including that of Mr. Duhamel and Ms. Tucker who stated the Hemingford tower was not "in the course of construction" when the collapse occurred.

Royal relies upon dictionary definitions of the terms construction and the verb form of construct. Royal argues DBE understood the work being done to the tower as "construction" as evidenced by the contract between DBE and SST. Additionally, DBE's lawsuit against SST alleges SST was negligent for failing to properly supervise the construction being carried out by its agents. Further, Royal argues the act of making the tower strong enough to hold a digital antenna, by making alterations to structural members of the tower, constitutes "construction."

Construction is defined as "[t]he action of constructing. 1. a. The action of framing, devising, or forming, by the putting together of parts; erection, building." OXFORD ENGLISH DICTIONARY (2d ed. 1989). Additionally, the verb form of construct means, "[t]o make or form by fitting the parts together; to frame, build, erect." *Id.* The parties do not propose different definitions of the term. However, the difference between the manner in which the parties use the term is whether "construction" is used in the policy to describe creating something new as opposed to changing something that already exists.

The dictionary definitions for construction do not embrace the idea of reconstruction. Similarly, the district court in *Myers* determined the phrase "process of construction" was not ambiguous and did not incorporate the idea of reconstruction. *Myers v. Merrimack Mut. Fire Ins. Co.*, 601 F. Supp. 620, 623 (D.C. Ill. 1985). "When used in this sense the word 'construction' imports the building or erection of something which theretofore did not exist; the creation of something new rather than the repair or improvement of something already existing." *Myers*, 601 F. Supp. at 623 (**quoting** *Travelers Indem. Co. v. Wilkes County*, 116 S.E.2d 314, 317 (Ga. Ct. App. 1960)). On appeal the Seventh Circuit agreed based on the probable purpose of the clause and limiting the construction period. *Myers v. Merrimack Mut. Fire Ins. Co.*, 788 F.2d 468, 472 (7th Cir. 1986) (holding "that in an insurance policy, the term construction does not include repairs, maintenance, reconstruction, renovation and the like to an already existing structure.") (citing cases); **but see** *Warren Davis Props. V, L.L.C. v. United Fire & Cas. Co.*, 111 S.W.3d 515, 522 (Mo. Ct. App. 2003) (holding "we find that activities encompassing the renovation of a building are construction" when determining whether building was "vacant" under the policy).

The Court finds the policy language "in the course of construction" is unambiguous. The plain language of the insurance policy supports DBE's position that the phrase refers to the creation of something new.  The policy differentiates between "construction" and other activities such as repair, maintenance, alteration, renovation and remodeling to an existing tower or building.  **See, e.g.,** Exhibit 18, p. 6 and 15.  Accordingly, under the natural and obvious meaning of the term "construction," in conjunction with its use in the policy, construed as a whole, the Court finds the term unambiguous and it cannot be reasonably construed to include the work being done on the Hemingford tower when it collapsed.  Therefore, Royal cannot deny coverage under the "course of construction" provision in the policy.

### 3.   Faulty Workmanship

Royal argues the policy specifically excludes coverage for loss or damage to the tower because the collapse was caused as a result of "faulty, inadequate or defective" "workmanship, repair, construction, renovation or remodeling" "of part or all of any property on or off insured 'Premises or Location(s).'"  **See** Exhibit 18, p. 14-15 (Exclusion 2(i)(2)). Royal contends Exclusion 2(i)(2) applies to the Hemingford tower because the tower collapsed due to faulty workmanship of the Mid-Central crew.  The parties dispute whether the exclusion applies only to defective products incorporated into a finished product or also to negligent practices of a contractor during the work process.  In addition to its contention Exclusion 2(i)(2) applies only to faulty products, DBE contends the clause "of part or all of any property" means the exclusion applies only to workmanship <u>of</u> the tower, rather than working <u>on</u> the tower.  **See** Filing No. 104, p. 16 (Brief).

The Nebraska state courts have not construed workmanship in the context of an insurance contract.  However, the dictionary definition of workmanship is:

> 1. The performance or execution of work or a work; work, labour: in early use often, the labour or amount of labour performed on a particular task or piece of work.
> 2. Action, agency, operation.
> 3. That which is wrought or made by a workman or craftsman; (a person's) work.

OXFORD ENGLISH DICTIONARY (2d ed. 1989).

Here, the term workmanship is subject to two meanings, both a product and a process. The difference in the parties' constructions is whether the term incorporates either or both of the process of making and affixing the diagonal cross bars to the tower and/or the process of installation on the tower. The distinction in this case is nearly nonexistent. DBE contends the exclusion covers the circumstances where the flawed process remains with the finished structure at the completion of the modification (flawed finished product), rather than the circumstance where the flawed process would result in no flaw to the finished structure, absent the collapse, (flawed process leading to finished product). However, the difference in the parties' constructions of workmanship does not render the insurance contract ambiguous because the meanings are not "conflicting interpretations or meanings." *Guerrier*, 663 N.W.2d at 135. Accordingly, the Court finds the term workmanship is unambiguous. **See, e.g.,** ***City of Burlington v. Hartford Steam Boiler Insp. & Ins. Co.***, 190 F. Supp. 2d 663, 672-73 (D. Vt. 2002) (holding faulty workmanship provision of insurance contract exclusion was unambiguous) (citing cases); **but see** ***Allstate Ins. Co. v. Smith***, 929 F.2d 447, 450 (9th Cir. 1991) (finding term ambiguous).

DBE primarily relies upon ***Barre***. In ***Barre***, the Supreme Court of Vermont held the term faulty workmanship incorporates faults in the construction process of a product, but not the negligent practices of a contractor during the construction process. ***Barre v. New Hampshire Ins. Co.***, 396 A.2d 121, 122-23 (Vt. 1978); **see also** ***Otis Elevator Co. v. Factory Mut. Ins. Co.***, 353 F. Supp. 2d 274, 281 (D. Conn. 2005) (holding builder's risk policy did not exclude "accidental damage resulting from subcontractor negligence unrelated to the quality of any product or process"); ***Burlington***, 190 F. Supp. 2d at 671-72. In ***Barre***, a structure collapsed, not due to a defect in the structure or quality of the product, but due to the contractors' failure to use adequate temporary cables to support the structure. ***Barre***, 396 A.2d at 122. The ***Barre*** court determined the policy at issue excluded coverage for damage to the structure caused by a poor quality product (due to defective materials or faults when creating the product), however the exclusion did not apply to accidental damage to the structure caused by the builder's negligence. ***Id.*** at 122-23.

The ***Barre*** case is distinguishable from the instant action.  The difference between the ***Barre*** insurance policy and the insurance policy in the instant case is the ***Barre*** policy is a "builder's risk" policy of insurance.  The ***Barre*** policy "insured the structure during construction, together with materials, equipment and supplies to be used therein." ***Id.*** at 122.  The ***Barre*** court construed the policy language based on a reading of the policy as a whole, without resort to dictionary definitions. ***Id.***  Accordingly, the Court finds the ***Barre*** opinion has no bearing on this case.

In this matter, the policy is a commercial property coverage policy, that is the policy is unrelated to the activity, or modifications, being performed at the time of the collapse.  In fact, as discussed above, towers in the course of construction or while undergoing repair or alteration, if the loss is caused by the repair or alteration, are specifically regarded as "not covered property." **See** Exhibit 18, p. 6.  The exclusionary language contained in Exclusion 2(i) expands the gap of coverage to include any faulty materials or workmanship which would otherwise be covered under the policy, even though associated with repair or construction, etc.  Exclusion 2(i)(2) further extends the exclusion to faulty workmanship generally, not confined to a particular type of activity such as construction or renovation, etc., which are listed separately. **See** Exhibit 18, p. 15.  Additionally, the location of the term workmanship in the policy, in conjunction with planning (Exclusion 2(i)(1)) and maintenance (Exclusion 2(i)(4)), supports Royal's interpretation of the term to include the building, or modification, process. **See, e.g., *Schultz v. Erie Ins. Group***, 754 N.E.2d 971, 976-77 (Ind. App. 2001).

Accordingly, under the natural and obvious meaning of the term "workmanship," in conjunction with its use in the policy, construed as a whole, the Court finds the term unambiguous.  The term workmanship is reasonably construed to include the work being done on the Hemingford tower when it collapsed.  The tower collapsed due to an error in the process or procedure in producing the finished product.  There is no evidence the product (tower or diagonals) would have been flawed by the Mid-Century crew's failure to use temporary bracing, absent the collapse.  However, there is no dispute the process or procedure used to modify the tower, specifically to replace the diagonal bars, caused the tower's collapse.  Therefore, it was the very processes used to replace the diagonal bars,

which caused the collapse, rather than "simply . . . subcontractor negligence unrelated to the quality of any product or process." *Otis Elevator*, 353 F. Supp. 2d at 281 (finding coverage existed for negligent testing of unflawed finished product). Therefore, the Court finds the insurance contract's exclusion for faulty workmanship applies to Hemingford tower at the time of its collapse.

### 4.    Faulty Materials

Royal argues the policy specifically excludes coverage for loss or damage to the tower because the collapse was caused as a result of "faulty, inadequate or defective" "materials used in repair, construction, renovation or remodeling." **See** Exhibit 18, p. 14-15 (Exclusion 2(i)(3)). Royal contends Exclusion 2(i)(3) applies to the Hemingford tower because the Mid-Century crew used inadequate materials - that is the crew failed to use adequate temporary braces on the tower as they performed the work. Further, Royal states the lack of temporary braces compromised the tower causing the collapse. DBE counters that the collapse was caused by a failure to use appropriate equipment, rather than the use of faulty, inadequate or defective materials.

Royal relies on *Plaza Equities Corp. v. Aetna Cas. & Sur. Co.*, 372 F. Supp. 1325 (D.C.N.Y. 1974) in support of its position. However, *Plaza* actually supports DBE's position. The *Plaza* court determined the deficiency causing the collapse of a statue was in the design of structural support, or lack thereof, for the statue. The *Plaza* court distinguished the case from another case where no defect in the insured property itself was found. *Id.* at 1329 (**comparing** *Equitable Fire & Marine Ins. Co. v. Allied Steel Constr. Co.*, 421 F.2d 512, 514 (10th Cir. 1970) (construing the "faulty workmanship" exclusion to mean "a defect in the way some part of the (insured property) is constructed.")). In *Plaza*, the defect was the failure to design adequate permanent structural support for the heavy statue, a defect in the materials used in the insured property. *Id.*

In contrast, DBE contends there was no defect in the tower or its replacement diagonal bars, but the defect was in the failure to use additional equipment to provide <u>temporary</u> alternative structural support for the tower. DBE argues when the defect does not go into the

structure, it is not "material," but rather "equipment" used in the process.  **See** ***Barre***, 396 A.2d at 122 (failure of contractor to use appropriate temporary support structure did not constitute "faulty materials").

Here, the insurance policy unambiguously supports DBE's interpretation of "materials" in Exclusion 2(i)(3).  The policy specifically excludes coverage for towers "in the course of construction" or undergoing repair or alteration.  **See** Exhibit 18, p. 6.  Therefore, for the policy to use the phrase "materials used in repair, construction" to include the equipment used during the repair or construction would render the phrase partially redundant and without effect given the earlier exclusionary language.  Because this Court must give effect to every part of the insurance policy without reading ambiguity into the policy, the term materials must only mean an internal defect in the parts used in the damaged tower, rather than a defect in the type of equipment used external to the insured tower.  Additionally, under the natural and obvious meaning of the term "materials," the Court finds the term unambiguous and it cannot be reasonably construed to include the failure to use a temporary support structure at the time work was being done on the Hemingford tower when it collapsed.  Accordingly, the Court finds Exclusion 2(i)(3) regarding faulty materials is not applicable in this case.

## B.    DBE's Counterclaims

The Court must evaluate the merit of DBE's counterclaims because the Court finds (1) the Hemingford tower was not covered property under the insurance contract as the tower was undergoing alteration, which alteration caused the collapse, or, alternatively, (2) the faulty workmanship exclusion applies to exclude coverage.  Although no insurance coverage exists under the terms of the insurance policy, DBE claims Royal is liable for the property damage under the theories of promissory estoppel, reformation or negligence.

### 1.    Promissory Estoppel

"Recovery on a theory of promissory estoppel is based upon the principle that injustice can be avoided only by enforcement of a promise." ***Folgers Architects Ltd. v. Kerns***, 633 N.W.2d 114, 121 (Neb. 2001).  Nebraska follows the Restatement (Second) of Contracts §

90 (1981) with regard to promissory estoppel. **Yankton Prod. Credit Assn. v. Larsen**, 365 N.W.2d 430, 433 (Neb. 1985). The Restatement provides as follows:

> (1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) Contracts § 90.

"Stated another way, a cause of action for promissory estoppel is based upon a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee which does in fact induce such action or forbearance." **Triple 7, Inc. v. Intervet, Inc.**, 338 F. Supp. 2d 1082, 1086 (D. Neb. 2004) (quoting **Goff-Hamel v. Obstetricians & Gyns., P.C.**, 588 N.W.2d 798, 804 (1999)). Further, "[p]romissory estoppel provides for damages as justice requires and does not attempt to provide the plaintiff damages based upon the benefit of the bargain." **Id.** at 1087 (**citing Rosnick v. Dinsmore**, 457 N.W.2d 793, 799 (Neb. 1990)). Nebraska law requires that reliance be reasonable and foreseeable. **Id.** (**citing Hawkins Constr. Co. v. Reiman Corp.**, 511 N.W.2d 113, 117 (1994). "When an unambiguous contract exists that covers the issue for which damages are sought, promissory estoppel is not a viable theory of recovery." **Folgers Architects Ltd. v. Kerns**, 633 N.W.2d 114, 121 (Neb. 2001).

In the present case, the relevant elements are (1) whether Royal made a clear and definite promise to DBE which Royal reasonably expected or should have expected would induce DBE to enter into the insurance contract; (2) whether DBE was, in fact, induced to act by such offer; (3) whether the action taken by DBE was detrimental to it; and (4) whether justice requires that Royal reimburse DBE for damages incurred as a result of the promise. **See Goff-Hamel**, 588 N.W.2d at 804-05.

DBE contends Royal was aware of the modifications being made to the Hemingford tower when Royal issued the proposal and binder for insurance. Additionally, DBE argues the insurance premium reflected the "exposure presented to Royal" which included the projected

modifications. **See** Exhibit 22 at 7-1. Finally, DBE states the proposal does not contain the exclusions now relied upon by Royal to deny coverage, but states the proposal is based on a thorough knowledge of DBE's business and customized to fit the particular exposure risks of each client. **See** *id.* at 3-5. DBE argues that based on these facts, there can be no question but Royal intended the 25-page proposal to induce DBE to purchase insurance. DBE did purchase insurance for the tower and paid a premium for coverage. DBE argues Royal is estopped from claiming coverage for the tower is subject to the policy exclusions which were not contained in the proposal. Alternatively, DBE contends a grave injustice would exists if Royal is allowed to keep the insurance premium for the Hemingford tower for the period July 1, 2002 to September 30, 2002, due to the lack of coverage.

Royal argues the evidence before the Court is void of any discussions either between Royal and DBE specifically stating the Hemingford tower would be covered while undergoing alterations or during the upgrade for a digital antenna, nor did DBE ever explicitly request such coverage. The proposal does specifically state that the proposal does not bind coverage and that any discrepancy between the proposal and a future policy would be governed by the policy language. **See** Exhibit 22 (Proposal). As of June 27, 2002, Royal was the only insurance carrier to propose coverage for the DBE towers. Accordingly, Royal argues, based on these facts, DBE has failed to establish the estoppel claim.

The Court finds DBE has failed to show any specific promise was made by Royal to provide coverage for the Hemingford tower without exclusion. **See *Clark v. Kellogg Co.*,** 205 F.3d 1079, 1083 (8th Cir. 2000) (holding indefinite promise does not support promissory estoppel claim). Nor has DBE shown that the tower would be covered absent the applicable exclusions while undergoing modifications. There is no doubt Royal was aware the tower was to undergo modifications for a digital antenna prior to issuing the proposal. However, Royal requested evidence of "certificates of insurance with adequate limits from all subcontractors that work on and maintain [its] towers and that [DBE is] listed as additional insured on those policies[, which] is particularly important with the upgrade to HDTV." Exhibit 20 at 2.

Neither did Royal promise coverage by failing to include in the proposal the additional exclusions now relied upon from the policy. The proposal contained several warnings about

23

the possible differences in the breadth of coverage between the proposal and any eventual policy. Additionally, the insurance proposal was lengthy, however the insurance policy is substantially longer with several pages of exclusions, which should have alerted DBE to differences in the two documents. Finally, where, as here, a contract is formed subsequent to the alleged promise upon which estoppel is asserted, there is no injustice in requiring the parties to abide by their contract. Accordingly, the Court finds DBE has failed meet its burden of proving the elements to support a promissory estoppel claim.

### 2.    Reformation

"A court may reform an agreement when there has been either a mutual mistake or a unilateral mistake caused by fraud or inequitable conduct on the part of the party against whom reformation is sought." *Par 3, Inc. v. Livingston*, 686 N.W.2d 369, 373 (Neb. 2004). "The right of reformation presupposes that the instrument does not express the true intent of the parties, and the purpose of reformation is to make an erroneous instrument express the real agreement." *Twin Towers Dev., Inc. v. Butternut Apts., L.P.*, 599 N.W.2d 839, 844 (Neb. 1999). To overcome the presumption that an agreement correctly expresses the parties' intent and to obtain reformation, the party seeking reformation must offer clear, convincing, and satisfactory evidence. *Jim's Dodge Country v. LeGrande Excavating*, 575 N.W.2d 890, 894 (1998). "If the proofs are doubtful and unsatisfactory and if there is a failure to overcome this presumption by testimony entirely plain and convincing beyond reasonable controversy, the writing will be held to express correctly the intention of the parties. There is no question this is the rule in Nebraska." *Corrigan v. Fireman's Fund Ins. Co.*, 141 N.W.2d 170, 174-75 (Neb. 1966) (internal quotation omitted). In an insurance contract context, "[t]he application for insurance is usually given great weight in determining the intention of the parties in a suit for reformation." *Rubinson v. North Am. Acc. Ins. Co. of Chicago, Ill.*, 246 N.W. 349, 350 (Neb. 1933). Further, the failure of the insured to read the policy and correct mistakes before a loss occurs is not required for reformation. **See** *Corrigan*, 141 N.W.2d at 176 (**quoting** *Robinson v. Union Auto. Ins. Co.*, 198 N.W. 166, 168 (1924)).

DBE seeks to have the insurance policy reformed to include only those exclusions contained in the insurance proposal.  DBE does not allege either fraud or inequitable conduct on Royal's part.  DBE appears to allege mutual mistake because both DBE and Royal intended the Hemingford tower to be insured at the time of the collapse.  Specifically, an insurance policy was in place stating the Hemingford tower was insured for $5 million and DBE had paid a premium for such insurance to cover the period during the collapse, which included the time period intended for modifications to the tower.  DBE argues reformation is appropriate in this matter because DBE provided truthful information to Royal in the application, including information about the Hemingford tower modifications, and Royal's policy was represented to meet the specific needs of DBE.

Royal argues DBE has failed to prove either a mutual mistake or a unilateral mistake. Further, Royal contends reformation would not be appropriate in this matter because any reformation would revert to the content of either the insurance proposal or binder, which both clearly state the insurance policy language would be controlling.  Finally, Royal asserts that although neither the insurance proposal nor binder contain the exclusionary language relied upon by Royal to deny coverage, the documents do not affirmatively provide for coverage under the circumstances of the tower's collapse either.

The Court finds DBE fails to provide any support for a reformation claim based on unilateral mistake caused by fraud or inequitable conduct.  Accordingly, the Court will evaluate DBE's claim under a mutual mistake analysis.  Under Nebraska case law:

> A mutual mistake is a belief shared by the parties which is not in accord with the facts.  A mutual mistake is one common to both parties in reference to the instrument to be reformed, both parties laboring under the same misconception about their instrument. A mutual mistake exists where there has been a meeting of the minds of the parties and an agreement actually entered into, but the agreement in its written form does not express what was really intended by the parties.

*Jim's Dodge*, 575 N.W.2d at 894 (internal citations omitted).  A mutual mistake may include a scrivener's error, for example.  *Id.*

The evidence in the present case does not clearly and convincingly indicate that both DBE and Royal had the same understanding concerning the exact exclusions to be used in the insurance policy and that the policy fails to express some common belief or understanding of the parties.  Rather, the evidence indicates that the parties never had any discussions about whether the Hemingford tower would be covered while undergoing alterations or without any of the additional exclusions as were contained in the policy.  Neither party ever communicated with the other about what each party's expectations in this regard were, however the insurance proposal and binder unequivocally stated the policy would dictate the terms of coverage and Royal required outside certificates of insurance related to the work being done on the Hemingford tower.  There is no evidence DBE either requested or Royal believed DBE wanted, in addition to standard property insurance, insurance to cover the type of work being performed to the Hemingford tower on September 24, 2002.  This is not to say, the Hemingford tower was uninsured at the time of the collapse.  Although DBE would have the Court believe Royal received the premium, but provided no coverage whatsoever for the period July 1, 2002 through the time of the collapse, the insurance policy did provide coverage with certain exceptions and exclusions contained in the policy.  Accordingly, the Court finds DBE has failed meet its burden of proving the elements to support a reformation claim.

### 3.    Negligence

"In order to prevail in a negligence action, a plaintiff must establish the defendant's duty to protect the plaintiff from injury, a failure to discharge that duty, and damages proximately caused by the failure to discharge that duty."  ***Keys v. Guthmann***, 676 N.W.2d 354, 358 (Neb. 2004).  In Nebraska, the Supreme Court has held an insurance agent has a duty to explain policy changes to a client.  ***Dahlke v. John F. Zimmer Ins. Agency, Inc.***, 515 N.W.2d 767, 771-72 (Neb. 1994) (holding agent had a duty to explain change in method of assessing deductible).  By extension, DBE contends an insurer has a duty to inform the insured of a substantial change between the insurance proposal and the policy.  Specifically, DBE argues Royal had a duty to advise DBE about any changes made between the insurance proposal and the policy.  DBE asserts the policy coverage did not conform to the coverage

26

agreed to between the parties and originally submitted by application. DBE states had it been notified of the policy exclusions, DBE may have negotiated for different terms or sought an alternative insurance provider.

Royal argues DBE's claim is one for negligent misrepresentation, however there is no evidence Royal supplied false information to DBE. Additionally, Royal contends it had no duty to anticipate coverage which DBE should have had, but was never requested. **See *Dahlke***, 515 N.W.2d at 770.

The Court finds no duty existed for Royal to notify DBE of each of the exclusions listed in the policy. The insurance proposal contains only a few listed exclusions, without explanation. However, the insurance policy contains many exclusions and definitions. Further, the proposal contains language notifying the insured the policy would dictate the terms of coverage. The proposal is not inconsistent with the policy. Finally, there is no evidence DBE sought insurance for the type of loss it suffered.

## CONCLUSION

The Court finds (1) the Hemingford tower was not covered property at the time of the collapse under the insurance contract as the tower was undergoing alteration, which alteration caused the collapse, or, alternatively, (2) the faulty workmanship exclusion applies to exclude coverage. Additionally, the Court finds Royal is not liable for the property damage under the theories of promissory estoppel, reformation or negligence. Accordingly, the Court finds judgment should be entered for Royal on its claim for declaratory judgment and on each of DBE's counterclaims.

**IT IS ORDERED:**

1.      Judgment will be granted in a separate document for the plaintiff Royal Insurance Company of America and against the defendant Duhamel Broadcasting Company on all claims.

2.      The plaintiff's motion for leave to file a reply brief (Filing No. 124) is granted. The reply brief (Filing No. 124, Exhibit A), will be considered *instanter*.

27

3.      The defendant's oral motions for judgment as a matter of law are denied.

4.      The plaintiff's motion for involuntary dismissal of the defendant's counterclaims (Filing No. 119) is granted as stated above.

Dated this 9th day of May, 2005.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge